FILED

2009 Oct-14  PM 03:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

Sharon  Harris
Clerk, U.S. District Court
1729 5TH AVE N STE 140
BIRMINGHAM  AL  35203-2050

―――――――――――――――――――――――――――――

October 13, 2009

**Appeal Number: 07-14648-EE**
Case Style: USA v. US Infrastructure, Inc.
District Court Number:  05-00543 CR-2-CLS-PWG

TO:   Sharon  Harris

CC:   Anthony Aaron Joseph

CC:   Roger A. Brown

CC:   Bob Kirpalani

CC:   John P. Fonte

CC:   John J. Powers, III

CC:   Administrative File

# United States Court of Appeals

Eleventh Circuit

56 Forsyth Street, N.W.

Atlanta, Georgia  30303

**Thomas K. Kahn**

Clerk

For rules and forms visit

www.ca11.uscourts.gov

October 13, 2009

Sharon  Harris

Clerk, U.S. District Court

1729 5TH AVE N STE 140

BIRMINGHAM  AL  35203-2050

**Appeal Number: 07-14648-EE**

Case Style: USA v. US Infrastructure, Inc.

District Court Number:  05-00543 CR-2-CLS-PWG

The enclosed certified copy of the judgment and a copy of this court's opinion are hereby issued
as the mandate of this court.

The clerk of the court or agency shown above is requested to acknowledge receipt on
the copy of this letter enclosed to the clerk.

A copy of this letter, and the judgment form if noted above, but not a copy of the court's
decision, is also being mailed to counsel and pro se parties. A copy of the court's decision
was previously mailed to counsel and pro se parties on the date it was issued.

Sincerely,

THOMAS K. KAHN, Clerk

Reply To: James O. Delaney (404) 335-6113

Encl.

MDT-1 (06/2006)

# United States Court of Appeals
## For the Eleventh Circuit

No. 07-14648

District Court Docket No.
05-00543-CR-2-CLS-PWG

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

Jul 29, 2009

THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

US INFRASTRUCTURE, INC.,
EDWARD T. KEY, JR.,
SOHAN P. SINGH,

Defendants-Appellants.

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

-----------------------------------------------------------------

Appeals from the United States District Court
for the Northern District of Alabama

-----------------------------------------------------------------

J U D G M E N T

It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.

ISSUED AS MANDATE
OCT 1 3 2009
U.S. COURT OF APPEALS
ATLANTA, GA.

Entered:      July 29, 2009
For the Court:  Thomas K. Kahn, Clerk
By:  Gilman, Nancy

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-14648

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 29, 2009
THOMAS K. KAHN
CLERK

D.C. Docket No. 05-00543-CR-2-CLS-PWG

UNITED STATES OF AMERICA,

Plaintiff-Appelle.

versus

US INFRASTRUCTURE, INC.,
EDWARD T. KEY, JR.,
SOHAN P. SINGH,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Alabama

_____

(July 29, 2009)

Before TJOFLAT and EDMONDSON, Circuit Judges, and RYSKAMP,* District
Judge.

_____

* Honorable Kenneth L. Ryskamp, United States District Judge for the Southern District of
Florida, sitting by designation.

RYSKAMP, District Judge:

Appellants, a corporation and two of its officers, seek review of their convictions of various bribery charges.  The government charged that appellants bribed certain officials of Jefferson County, Alabama in return for government contracts.  The jury found appellants guilty on all charges.  We have reviewed the lengthy record and find no reversible error.

## I.   BACKGROUND

In 1996, after a Clean Water Act lawsuit alleging that untreated waste illegally entered the area's rivers and streams, Jefferson County ("County") entered into a consent decree requiring the County to repair and rehabilitate its sewers and wastewater treatment plants.  The cost of the rehabilitation amounted to nearly $3 billion.

The consent decree process required the County to hire engineering firms through no-bid contracts.  The Jefferson County Environmental Services Department ("JCESD") supervised the process of rehabilitating the sewer and treatment plants.  County Commissioner Jewell "Chris" McNair ("McNair") oversaw the operation of the JCESD, which included JCESD Director Jack Swann ("Swann"), Assistant Director Harry Chandler ("Chandler"), and Chairman, Product Review Committee Donald Ellis ("Ellis").  McNair supervised the JCESD

2

from 1988 until his March 29, 2001 retirement.

McNair decided which engineering firms to hire for the project and selected US Infrastructure, Inc. ("USI") as the primary design firm. USI was awarded over $50 million in contracts during the sewer rehabilitation project.

Sohan Singh ("Singh") founded USI in 1994 and remains its President and principal owner. Edward T. Key, Jr. ("Key") is Vice President of USI.

McNair owned and operated the Chris McNair Studio and Art Gallery ("McNair Studio"), which, as explained by his daughter Kim McNair Brock ("Brock"), was "a family business where we do photography, custom framing. And after a period of time, we had an art gallery and banquet facility." The McNair Studio was a private enterprise unrelated to McNair's position with the County.

On August 29, 2005, a federal grand jury sitting in Birmingham, Alabama returned a 127 Count Second Superseding Indictment that, *inter alia*, charged USI, Singh and Key with conspiring to commit bribery by paying McNair approximately $140,000 for work not actually performed by McNair (18 U.S.C. § 371) (Count 32), bribing McNair by giving him checks for that bogus work (18 U.S.C. § 666) (Counts 38-45, 47-49), conspiring to commit bribery by giving McNair approximately $335,000 in cash drawn from USI funds (18 U.S.C. § 371)

3

(Count 50), bribing Chandler with a $2,000 gift card to Parisian's Department Store (18 U.S.C. § 666) (Count 73) and an envelope containing $1,500 in cash (18 U.S.C. § 666) (Count 74), and obstructing justice by intentionally withholding documents from the grand jury and providing a false letter of compliance with the grand jury's subpoena (18 U.S.C. § 1503) (Count 127). The Indictment also charged Key and USI with bribing Ellis with an envelope containing $500 in cash (18 U.S.C. § 666)(Count 88). The district court severed the Indictment into five separate trials, of which this trial was one. The jury found appellants guilty on all counts.[1]

## II.   DISCUSSION

### A.   Sufficiency of the Evidence

Appellants attack the sufficiency of the evidence as to the bogus invoice scheme and the cash bribes conspiracy. Appellants also claim that the government failed to prove that appellants possessed corrupt intent.

---

[1] McNair was charged with the USI defendants in the two conspiracy counts and separately with five counts of accepting bribes from appellants, but was severed from the USI defendants. Prior to his trial, he pleaded guilty to one count of conspiracy, Count 32. The government subsequently dismissed him as a defendant to the other counts involving USI. McNair was also convicted of numerous offenses in the first of the five trials.

4

## 1.    Standard of Review

This Circuit reviews the sufficiency of the evidence *de novo*, examining the evidence in the light most favorable to the government and resolving all reasonable inferences and credibility issues in favor of the guilty verdicts. *United States v. Suba*, 132 F.3d 662, 671 (11th Cir. 1998).  This Circuit "will not overturn a conviction on the ground of insufficient evidence 'unless no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Wright*, 392 F.3d 1269, 1273 (11th Cir. 2004) (quoting *United States v. Christo*, 129 F.3d 578, 579 (11th Cir. 1997)).  The evidence need not be inconsistent with every hypothesis other than guilt, "as the jury is free to choose among reasonable constructions of the evidence." *Suba*, 132 F.3d at 671-72.

## 2.    Bribery of McNair

To sustain the conspiracy convictions, the Government must prove the existence of an agreement to achieve an unlawful objective, here, exchanging things of value for McNair's influence; the defendant's knowing and voluntary participation in the conspiracy; and an overt act in furtherance of the conspiracy. *Suba*, 132 F.3d at 672.  Since illegal conspiracies are secretive by nature, the existence of the agreement and the defendant's participation in the conspiracy may

be proven entirely from circumstantial evidence. *Id.; accord United States v. Massey*, 89 F.3d 1433, 1438-39 (11th Cir. 1996) (conspiracy to commit bribery). "To hold otherwise 'would allow [defendants] to escape liability... with winks and nods, even when the evidence as a whole proves that there has been a meeting of the minds to exchange official action for money.'" *Massey*, 89 F.3d at 1439 (quotation omitted). The meeting of the minds is provable through inferences drawn from the participants' conduct or other circumstantial evidence of the scheme. *United States v. Obregon*, 893 F.2d 1307, 1311 (11th Cir. 1990).

To sustain the bribery convictions, the government must prove that appellants paid the bogus McNair Studio invoices with the corrupt intent to influence or reward McNair. *United States v. Castro*, 89 F.3d 1443, 1454 (11th Cir. 1996).

Several McNair Studio employees testified that the Studio did not and could not have created the materials for which USI was billed. The evidence demonstrating the materials McNair Studio supposedly created for USI include checks by which USI paid McNair Studio, each one signed by Singh; McNair Studio invoices to USI that correspond to the checks; USI's copies of the McNair Studio invoices; and the actual materials McNair Studio supposedly created and billed to USI. Brock worked at the Studio from 1993 through 2001, where she

6

handled McNair's checking account and the Studio's cash receipts. For each invoice Brock received either from McNair or by fax from USI, she also received a USI "worksheet" containing purchase order numbers and billing information. Brock testified that without the worksheets, she would have had no idea what to put on the invoices. Brock would prepare an invoice, tell her father when the invoice was finished, and then she or her sister would fax or send the invoice to USI. For every invoice shown to her at trial, Brock was unaware of any work that McNair Studio performed to earn the payments that USI made pursuant to the invoices. The amount of the bogus invoices totaled nearly $140,000. In 1999 to 2000, McNair built an addition that more than doubled the studio's size. Brock was "sure that [McNair] couldn't afford it, or, you know, how is he going to do something on a large scale like that," and told McNair so.

Shenita Hatcher ("Hatcher"), the McNair Studio graphic designer, did not create and never saw the materials supposedly created for USI. She never created any documents while at McNair Studio that even resembled those exhibits. She was unaware of anything at McNair Studio that resembled the binders that contained the purported projects for USI. She also explained that McNair Studio did not have the lamination machine necessary to create such binders.

Several USI employees testified that USI actually created the materials.

7

Angela Wilson ("Wilson") explained that she or other USI employees created a series of presentations, proposals and statements of qualifications contained in the exhibits. The text for these documents came from USI files, and the materials for the documents were available at USI. USI purchased a laminating machine in 1999. Wilson did the binding and laminating herself. Wilson prepared the documents at Key's request and did not talk to or work with McNair Studio in creating any of the documents.

Mary Duffy ("Duffy"), another USI employee, identified a $12,595 invoice from McNair Studio for "Marketing and proposal services for Atlanta proposal," but explained that USI prepared the proposal by using a Kinko's copy service. She acknowledged that the McNair Studio invoice described work that USI itself performed.

Rosherren Williams ("Williams"), who worked at USI for several months in 1999, typed a series of letters of interest for Key. The letters were essentially form letters that required little effort to produce. At least one letter that USI prepared after Williams left the company bore Williams's initials as the typist.

The record is devoid of any evidence that McNair consulted with USI in any of the projects. Significantly, the Jefferson County contract awarded to USI during the relevant time strictly prohibited USI from hiring McNair, or any other

8

County employee, in any capacity.

USI gave McNair Studio's invoices special attention. From 1999 to the middle of 2000, USI paid its vendors weekly, and, after the middle of 2000, paid them bi-weekly. In contrast, USI typically paid McNair Studio either that day or the day after USI received McNair's invoices. While Singh did not typically hand-deliver checks to any other vendor, Singh routinely delivered the check to either McNair or his studio.

USI gave preferential treatment to JCESD officials, particularly McNair. Singh told Duffy that "[t]he department heads at Jefferson County were considered friends of the Company, and we were to treat him with the utmost respect and generally be friends with them." A USI document said that "when Sohan is here, he will only take calls from clients, County officials, and other VIP's." The document listed people to be "put through to Sohan, without question," with McNair at the top, followed by other JCESD officials.

McNair admitted to William Dawson ("Dawson"), an engineering contractor who received no-bid contracts from the JCESD between 1999 and 2003, that Singh bribed him. Dawson was convicted separately of paying bribes to McNair. Dawson testified that McNair called him in late 2003 and asked for money, telling him that Singh had been helping him pay his mortgage, but that

9

Singh had stopped doing so.  Specifically, Dawson testified that McNair said that "Singh had been making a note for him [McNair], and that he had to quit doing that, and he was behind and he needed some help."  Dawson explained that "the agreement was reached that I would buy a framed piece of art that was in his studio" for $2,700.

As this Circuit noted in *Suba*, "'a common purpose or plan may be inferred from a development and collocation of circumstances.'" 132 F.3d at 672 (quotation omitted).  The evidence shows an extended plan or scheme by USI, a company that received $50 million dollars in government contracts over a period of years, to pass nearly $140,000 through bogus invoice payments to the County Commissioner almost wholly responsible for that $50 million.  The large sum of money on both sides strongly suggests a common goal to increase each other's wealth through illegal means.  *See, e.g., United States v. Poole*, 878 F.2d 1389, 1392 (11th Cir. 1989) (intent to distribute illegal drugs can be shown from the quantity of drugs involved); *United States v. Perez*, 648 F.2d 219, 221 (5th Cir. 1981) (same).  In *United States v. Sutherland*, 656 F.2d 1181 (11th Cir. 1981), Maynard and Walker each collected numerous traffic tickets that were favorably disposed of by Sutherland, a municipal court judge.  Significantly, for any specific ticket there was no evidence "(1) that the ticket was delivered by Walker or

10

Maynard to Sutherland, (2) that money was delivered by Walker or Maynard to Sutherland, or (3) that Sutherland favorably disposed of the ticket in exchange for such money."  656 F.2d at 1187.  Nevertheless, this Court affirmed their conspiracy convictions based on "the overwhelming circumstantial evidence introduced by the government."  *Id*.

The record is more than sufficient to sustain the jury's verdict on the bogus invoice conspiracy.  To the extent appellants challenge the substantive bribery convictions based on the same arguments, this challenge is also rejected.

Appellants also claim that the government failed to prove "that the USI defendants intended to reward and influence McNair."  Yet McNair admitted to Dawson that Singh had been paying his mortgage.

### 3.  The Cash Bribes Conspiracy

The indictment charged a pattern of substantial cash withdrawals from USI funds and comparable cash deposits by McNair into his personal bank account at similar times.  McNair's deposits totaled $46,100 in December 1999, $35,000 in January 2000, and $44,260 in July 2000.  McNair gave Brock the cash and told her to complete deposit slips for him or to make the deposits herself.  Although Brock did not know where her father got the cash for the deposits, she knew it did not come from the McNair Studio register or cash box and was not reflected in any of

11

McNair Studio's books.  Brock thought it unusual that her father had so much

cash, but when she asked him about it, "[h]e would tell us to just do what he

asked, to make the deposit, for whatever he asked us to do."  McNair had no

business other than McNair Studio.

The same day or the day immediately preceding McNair's deposits, Key and

Singh would cash USI checks or withdraw thousands of dollars in cash, sometimes

in amounts identical to the McNair deposits, from accounts at Compass Bank and

AmSouth Bank in Birmingham.[2]

In January 2000, Key deposited a $90,000 check from USI into a newly

opened personal account at Compass Bank and immediately began a series of

$9,000 withdrawals.[3]  The following month Key deposited a second $90,000

check into the account, and the $9,000 withdrawals continued.  In July 2002, Key

deposited a third $90,000 check, this time into his account at AmSouth Bank.

The day before the first $90,000 check was issued to Key, Singh requested

two checks from USI.  The first check was for $406,895.20, the second was for

---

[2] On December 2, 1999, Key cashed a $9,000 USI check to Singh, and McNair made a $9,000 cash deposit.  On November 17, 1999, and again on November 18, 1999, Key cashed a $9,000 USI check to Singh.  McNair made two cash deposits the next day, one for $9,000 and one for $8,000.

[3] The largest checks were for $9,000 because Key knew the banks were required to send Currency Transaction Reports to the government for transactions greater than $10,000.

$150,000. USI issued the checks after "Mr. Singh said that he had loaned money to the company and he wanted to be reimbursed." USI's accounting records did not indicate that USI owed Singh $406,000. An FBI agent testified that he traced the $406,000 check to a new account in the name of Singh and his son in Nashville. The second $90,000 check to Key came from this account.

When questioned about his USI stock and his inability to account for the three $90,000 checks that he deposited to his accounts, Key made inconsistent claims that he gave his stock back for free and that he was paid $180,000 for that same stock. Key also claimed that he did not recall receiving and depositing a $90,000 check, which was similarly incredible. The evidence showed that much of the $270,000 was withdrawn in roughly $9,000 increments at times when McNair was making similar cash deposits. The record was more than adequate to support the jury's guilty verdicts on Count 50. Nor are the two conspiracies "inconsistent in theory:" evidence establishing appellants' participation in the bogus invoice conspiracy also supports appellants' participation in the cash bribes conspiracy.

### 4. Bribery of Chandler and Ellis

Key and Singh told Chandler of their intent to hide the fact that they had given things of value to Jefferson County employees. In 2003 and 2004, Key gave

Chandler various "gifts," including a gift card for Parisian's Department Store worth $2,000, $1,500 cash, a watch, and another $800 in cash. Chandler, assisting the government, recorded a conversation in which Key told him that the cash Chandler received "ain't ever going to come to light here." Key added: "You don't need to worry about that," "that'll never come up... you don't need to be scared because that - that's never gonna come up." When Chandler said he was "scared that'd be a paper trail" for the gift card, Key responded, "there is nothing on that either," "[t]here's no connection to you or anybody else," "I'm not gonna expose you to anything."

Chandler also recorded a conversation with Singh. When Chandler referred to the Parisian's gift card, Singh said "No. We never gave you nothing. You shouldn't even think about that you know." Singh said that "all I'm saying, sir, for your convenience kinda thing...that never happened here."

Additionally, in 2002, Key gave Ellis an envelope containing $500 cash, saying that the money was for Ellis and another county employee to take a business trip for which the County would not pay Ellis's expenses. Ellis took both the money and the trip. Key also gave Ellis at least one gift card for Parisian's Department Store, that Ellis believed was worth $200, as an Easter gift in 2001.

Key told the FBI that neither he nor USI had ever given a gift greater than

14

$50 to any government official. USI's letter of compliance with the grand jury subpoena stated likewise. The subpoena requested records of "[a]ny and all payments... made directly or indirectly by USI and/or by any of its officers... for the benefit of any current or former elected or appointed public officials or employees...." USI's letter of compliance, which Key signed, purported to provide "[a] listing of all payments made by USI and its officers," explained that Key gave gifts to USI's "clients" every Christmas, and stated: "In all cases these gifts were valued at less than $50 each."

Appellants claim that the evidence established only that "gifts" were given to Chandler and Ellis and that there is no evidence that those gifts were given with the requisite corrupt intent to influence. The nature and size of the gifts belie their claim, however. Key and Singh expressed their intent to Chandler to hide the fact that those "gifts" were given and carried out that intent in both FBI interviews and USI's letter of compliance with the grand jury subpoena. The record was sufficient to allow the jury to conclude that the payments to Chandler and Ellis were bribes.

### 5. Obstruction of Justice

Key expressly told the FBI that neither he nor USI had ever given a gift greater than $50, and USI's letter of compliance, which Key signed, stated

likewise.  Key never revealed the $500 he gave to Ellis or the $1,500 he gave to

Chandler.  Substantial evidence supports the jury's verdict on the obstruction of

justice conviction.

## B.  Evidentiary Rulings

### 1.  Dawson

Appellants challenge the admissibility of Dawson's testimony about

McNair's statement that Singh was helping McNair pay his mortgage.  The district

court considered the admissibility of Dawson's testimony at both a pretrial hearing

and again just before Dawson testified.  The court's pretrial Order held that

Dawson's testimony would be "admissible to show intent, knowledge, and a

common plan or scheme under Federal Rule of Evidence 404(b)."  During the

pretrial hearing, the District Court asked several questions indicating that

McNair's statement was admissible as that of a co-conspirator pursuant to Fed. R.

Evid. 801(d)(2).  Appellants' arguments below and to this Court assume that such

was the basis on which this evidence  was admitted.

The government does not argue on appeal that Dawson's testimony was

admissible under Rule 801(d)(2).  During closing argument, defense counsel

referred to Dawson's testimony as if it had been admitted for the truth of the

matter asserted in McNair's statement: that Singh had been paying McNair's note.[4]
Accordingly, the government maintains that the statement was admissible as an
exception to the hearsay rule under Rule 804(b)(3).

A district court's evidentiary rulings are reviewed only for "a clear abuse of
discretion," *United States v. McLean*, 138 F.3d 1398, 1403 (11th Cir. 1998), and
this Court "will not hold that the district court abused its discretion where it
reached the correct result even if it did so for the wrong reason." *United States v.
Samaniego*, 345 F.3d 1280, 1283 (11th Cir. 2003). *See also United States v.
Maliszewski*, 161 F.3d 992, 1009 (6th Cir. 1998) (holding that declarant's
statement to his wife that someone was trying to remove him from a "drug-supply
loop" was not admissible under Rule 801(d)(2)(E) but was admissible under Rule
804(b)(3) even though district court did not consider the applicability of Rule
804(b)(3) as to that statement).

A hearsay statement that inculpates the accused is admissible if "(1) the
declarant is unavailable; (2) the statement so far tends to subject the declarant to
criminal liability that a reasonable person in his position would not have made the
statement unless he believed it to be true; and (3) the statement is corroborated by

---

[4]"They bring Bill Dawson in here.  He…said McNair told him Sohan Singh had been 'paying my mortgage and he quit'…That's what you call hearsay.  It's an exception to the hearsay rule, but it's still hearsay….I sure hope you don't convict my client because of that."

circumstances clearly indicating its trustworthiness." *United States v. Costa*, 31 F.3d 1073, 1077 (11th Cir. 1994).

McNair was "unavailable" within the meaning of Rule 804(a) because he was a codefendant under the same indictment as appellants and, therefore, could not be called as a witness. *United States v. Georgia Waste Sys., Inc.*, 731 F.2d 1580, 1582 (11th Cir. 1984); *accord United States v. Robbins,* 197 F.3d 829, 838 n.5 (7th Cir. 1999).

"Rule 804(b)(3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson v. United States*, 512 U.S. 594, 599, 114 S.Ct. 2431, 2435 (1994).  Whether the declarant's statement is against the declarant's penal interest "can only be answered in light of all the surrounding circumstances." *Id.* at 603-04, 114 S.Ct. at 2437.  McNair's statement that Singh had been paying McNair's note was against McNair's penal interest as it tended to show he had accepted bribes. *See United States v. Ford*, 435 F.3d 204, 215 (2d Cir. 2006); *United States v. Centracchio*, 265 F.3d 518, 525 (7th Cir. 2001)(admission by former police chief to receipt of cash bribes during plea allocution was self-inculpatory), *abrogated on other grounds, Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354 (2004).

18

Furthermore, McNair's statement was "truly inculpatory to him only because [it] did not seek to lessen blame *as to his crime* by spreading blame to others." *Centracchio*, 265 F.3d at 525-26. *See also Williamson*, 512 U.S. at 603, 114 S.Ct. at 2436 (contrasting self-inculpatory statements with those "merely attempt[ing] to shift blame or curry favor").

The district court did not hold an evidentiary hearing as to whether McNair's statement was against his interest, which appellants claim is reversible error. Where a district court erroneously admits evidence under Rule 801(d)(2)(E), an appellate court may review the evidence to determine whether the evidence was admissible pursuant to Rule 804(b)(3) even if the district court did not consider the applicability of Rule 804(b)(3).

Finally, McNair's statement is trustworthy because "'it [is] unlikely, judging from the circumstances, that the statement was fabricated.'" *United States v. Jernigan*, 341 F.3d 1273, 1288 (11th Cir. 2003) (quoting *United States v. Gomez*, 927 F.2d 1530, 1536 (11th Cir. 1991)). Given the context of McNair's relationship with Dawson, McNair had no reason to lie about Singh's payments. Dawson had previously bribed McNair and was a confidant of McNair's with regard to the bribery scheme. Courts have found that self-inculpatory statements are sufficiently corroborated where the evidence presented at trial supports the

19

veracity of the out-of-court statement and where the declarant makes the statement to someone with whom he shares a close relationship. *See United States v. Shukri,* 207 F.3d 412, 416-17 (7th Cir. 2000) (allowing self-inculpatory hearsay statements pursuant to Rule 804(b)(3) because evidence at trial supported truthfulness of the statements and because declarant made the statements to his brother-in-law who was a confederate in the theft conspiracy at issue). *See also Robbins,* 197 F.3d at 840 (deeming declarant's statement to his fiancé trustworthy under Rule 804(b)(3)); *United States v. Barone,* 114 F.3d 1284, 1296 (1st Cir. 1997) (deeming trustworthy hearsay declarant's statement pursuant to 804(b)(3) because statement was made to declarant's sister); *United States v. Matthews,* 20 F.3d 538, 546 (2d Cir. 1994) (deeming statements trustworthy because declarant made them in private to his girlfriend). The statement at issue here was not a custodial statement made to law enforcement officials, thereby obviating any concern that McNair was attempting to curry favor with the government by shifting blame to another individual. As discussed above, the evidence presented at trial was more than sufficient to demonstrate that McNair and Singh were operating a bribery conspiracy.

Upholding the admission of Dawson's testimony comports with Singh's rights under the Confrontation Clause. The Supreme Court held in *Crawford* that

testimonial evidence from an absent witness is admissible only if the witness is

both unavailable and the defendant had a prior opportunity to subject the declarant

to cross-examination.  541 U.S. at 68, 124 S.Ct. at 1374.  Given that McNair's

statement to Dawson was part of a private conversation, it is "nontestimonial"

within the meaning of *Crawford*, and *Crawford's* strict Confrontation Clause

requirements do not apply.  *See United States v. Brown*, 441 F.3d 1330, 1359

(11th Cir. 2006) (noting that the "*Crawford* rule applies only to testimonial

evidence"); *id*. at 1360 (private conversation "was not made under examination,

was not transcribed in a formal document, and was not made under circumstances

leading an objective person to reasonably believe the statement would be available

for use at a later trial.  Thus, it is not testimonial and its admission is not barred by

*Crawford*").

### 2.    Henson

Electrical engineer Gus Henson ("Henson") testified that he approached

McNair for a government contract after he worked for free for McNair Studio.  In

1999, Henson designed the electrical, plumbing, and air-conditioning systems for

the McNair Studio addition, using elevations sent to him by USI.  Had Henson

billed for the project, he would have charged $10,000.  After Henson prepared the

21

McNair Studio designs, he met with McNair to ask about getting work from the JCESD.

McNair "said there may be a possibility and he - he said I needed to talk with Mr. Swann." Before Henson left, McNair placed a call to a secretary "to see about getting [Henson] an appointment with Mr. Swann." McNair then asked Chandler "to see if we could develop a project...that Henson Engineering could perform," and Chandler's secretary set up a meeting between Swann, Chandler and Henson. At that meeting, Henson proposed a stream monitoring system and was awarded a $25,000 contract to build that system. Because Henson was not able to do the work that JCESD typically required, Chandler developed a project that "primarily was electrical and controls in nature" at McNair's request.

The district court allowed Henson's testimony on the grounds that it was "inextricably intertwined" with the charged offenses because the government had established the requisite "linkage" or "nexus" between appellants' and Henson's testimony. This Circuit has long held that evidence of criminal activity other than the crime charged is not extrinsic under Rule 404(b) if the evidence is inextricably intertwined with evidence of the charged offense. *E.g., Wright*, 392 F.3d at 1276 (11th Cir. 2004); *Gomez*, 927 F.2d at 1535. Rule 404(b) does not apply when the other act evidence is linked in time and circumstances with the charged crime and

concerns the context, motive or setup of the crime; or forms an integral part of the

crime; or is necessary to complete the story of the crime. *E.g., Wright*, 392 F.3d at

1276.  Moreover,

> Rule 404(b) does not specifically apply to exclude
> this evidence because it involves an extraneous
> offense committed by someone other than the defendant.
> The evidence was not introduced "to show that the
> defendant has a criminal disposition and that he can be
> expected to act in conformity therewith," so the policies
> underlying Rule 404(b) are inapplicable.

*United States v. Morano*, 697 F.2d 923, 926 (11th Cir. 1983) (quotation omitted);

*accord United States v. Meester*, 762 F.2d 867, 877 (11th Cir. 1985).  In *Gomez*,

Gomez was charged with importing and conspiring to import cocaine.  The court

allowed evidence that Zuluago entered into a drug transaction two months after

Gomez's arrest because a book found in Gomez's car contained Zuluago's phone

number, and another witness testified that he discussed Zuluago's drug activity

with Gomez.  927 F.2d at 1535.  This Court upheld the admission of that evidence

as inextricably intertwined because of its "relevan[ce] to the scheme and chain of

events surrounding the charged importation conspiracy."  *Id.*  Similarly in

*Meester*, the Court held that evidence that an unindicted co-conspirator had

engaged in crimes similar to those charged against the defendants was admissible

because it "served to establish a background for the later substantive acts charged

in the indictment and was therefore relevant to prove the existence and purpose of the ongoing conspiracies." 726 F.2d at 877. And in *United States v. Smith*, 122 F.3d 1355, 1359-60 (11th Cir. 1997), this Court found evidence of a third party's bank robbery inextricably intertwined with the bank robbery with which defendant was charged because "strong links" and "integral links" between the two established similar *modus operandi*.

The trial court reasoned that Henson's testimony would "tend to be evidence of a common plan, scheme and design of how business was being carried on in the Environmental Services Department at that time." The link was not only that Singh was with McNair when Henson approached McNair for a JCSD contract, but also that USI had sent Henson the McNair Studio elevations that Henson needed to perform his design work for the studio. Henson's testimony was relevant to the chain of events surrounding the charged crimes, including context and setup; specifically, that Singh had knowledge of McNair's willingness to exchange his influence for things of value as well as the opportunity to take advantage of that willingness. Indeed, USI, which itself performed free services for the McNair Studio renovation, assisted Henson in also performing free services for McNair by giving Henson the elevations that he needed to construct the engineering designs.

24

Appellants are wrong that Henson's testimony should have been excluded under Rule 403 on grounds of undue prejudice. Rule 403 is an extraordinary remedy that must be used sparingly because it results in the exclusion of concededly probative evidence. *E.g., Wright*, 392 F.3d at 1276. Thus, in cases where this Court has found other acts evidence inextricably intertwined with the crimes charged, the Court has refused to find that the evidence should nonetheless be excluded as unduly prejudicial, even when the other acts included evidence of violent crimes such as bank robbery, murder and arson. *See Smith*, 122 F.3d at 1360; *United States v. Fortenberry,* 971 F.2d 717, 721 (11th Cir. 1992); *United States v. Morano*, 697 F.2d 923, 926 (11th Cir. 1983). Even appellants' own cited authority explains that the test under Rule 403 is whether the other acts evidence was "'dragged in by the heels' solely for prejudicial impact." *United States v. Veltmann*, 6 F.3d 1483, 1500 (11th Cir. 1993). Given the strong connection between Henson's testimony and the crimes charged, such was not the case here. In any event, Henson did not implicate any of the appellants in a crime. Thus, if his testimony was admitted in error, that error was harmless. *E.g., United States v. Jones*, 28 F.3d 1574, 1582 (11th Cir. 1994), *vacated on other grounds*, 516 U.S. 1022, 116 S.Ct. 663 (1995).

25

### 3. Appellants' Proffered Experts

Various cash withdrawals from Singh's funds were taken to India to finance Singh's son's wedding, which cost the Singhs between $180,000 and $190,000.  Singh's wife, Kusum Singh ("Mrs. Singh") admitted on cross-examination that the cash taken to India for the wedding came from two cash withdrawals made by her husband from their private Sun Trust Bank account in Nashville.  Those cash withdrawals totaled $380,000.  Mrs. Singh and several other witnesses explained that because American dollars command large discounts in India, and because the Indian "bureaucracy" makes obtaining cash from checks or wire transfers very difficult, it is "common practice" to take American dollars into India whenever traveling there.  Appellants maintain that the cash withdrawals were solely for the purpose of financing the wedding.

Several defense witnesses testified at length about Indian culture generally and Indian weddings specifically.  The government never disputed that the Singhs' wedding costs were about $200,000, or that those costs were paid for in cash taken to India in $9,000 increments.  Accordingly, the district court did not abuse its discretion when it excluded a wedding planner's testimony "regarding the customs, obligations and social pressures associated with the lavishness of an Indian wedding," a jewelry expert's testimony "regarding the expense and value of

26

jewelry purchased in association with the wedding in question," and an Indian economist's testimony about "India's 'cash-culture' and the importance of United States currency in that culture."

A district court has broad discretion in deciding whether to permit expert testimony. *United States v. Frazier*, 387 F.3d 1244, 1258-59 (11th Cir. 2004). Exclusion of expert testimony will constitute reversible error only if it is "manifestly erroneous," *id*. at 1258 (quotation omitted), or "had a 'substantial impact on the outcome'" of trial. *United States v. Paradies*, 98 F.3d 1266, 1289 (11th Cir. 1996) (*quoting United States v. Sellers*, 906 F.2d 597, 601 (11th Cir. 1990)).

The excluded testimony was both cumulative and irrelevant. The jury would have learned nothing from expert witnesses that it did not already know and, in fact, was undisputed—that the wedding was very expensive and paid for by large amounts of cash sent to India for that purpose. *See, e.g., Frazier*, 387 F.3d at 1263 (expert testimony can be excluded if it is "cumulative"). The issue was whether the cash for the wedding came from Singh's personal Sun Trust account in Nashville or whether it came from the Birmingham cash transactions the Indictment alleged were used to bribe McNair. None of the proffered defense testimony would have addressed that issue. Thus, the court did not abuse its

discretion by excluding that testimony.

## C.     Jury Instructions

Appellants maintain that the trial court's instructions regarding the substantive charges failed to allow the jury the opportunity to consider their theory of the evidence. While a court should instruct a "jury on the defendant's defense theory if the theory has a foundation in evidence and legal support," *United States v. Schlei*, 122 F.3d 944, 969 (11th Cir. 1997) (quotation omitted), a theory of the defense instruction is not required "when the charge given adequately covers the substance of the requested instruction." *United States v. Ndiaye*, 434 F.3d 1270, 1293 (11th Cir. 2006). Refusing to give a proposed "instruction is reversible error only when (1) the proposed instruction is correct, (2) the instruction was not addressed in the charge actually given, and (3) the failure to give the requested instruction seriously impaired the defendant's ability to present an effective defense." *Id.*; *United States v. Arias-Izquierdo*, 449 F.3d 1168, 1185 (11th Cir. 2006).

After the court provided the parties with a copy of its "draft instructions," it asked if there was "any request for revision by defense counsel?" Appellants asked the court to include in its charge the final paragraph of its proposed Instruction 11, stating that bribery requires a "specific" *quid pro quo*. The court

refused that instruction.  Appellants then asked the court to give their proposed Instruction 10, that "holiday gifts" to public officials are not illegal "so long as such items are not given with the intent to corrupt."  The court refused appellants' specific language explaining: "I think I cover this adequately in my instructions…."  Appellants raised no further objections.  After the court charged the jury, it specifically inquired if there were "[a]ny exceptions to the oral charge of the court by any attorneys for the defendants."  Appellants replied:

> Your Honor, we just reiterate the previous requests to include the instructions regarding *quid pro quo* that we had previously asked the Court for. *But other than that, there are no further exceptions.*

(Emphasis added).

Appellants now claim that the district court erred by refusing its proposed Instructions 7 thru 13.[5]  Yet they never objected to the court's decision not to include their Instructions 7-9.  While they originally objected to the court's decision not to  include their Instruction 10, after the court explained that its draft instructions "cover this adequately," they did not object to the charge as given. Thus, appellants' claims of error with respect to their Instructions 7-10 have been waived, and can be reviewed only for plain error.  *Paradies*, 98 F.3d at 1289.

---

[5] Instructions 7, 8 and 9 were identical except they applied to Singh, Key and USI respectively.  Likewise, Instructions 11, 12 and 13 were identical except they applied to USI, Singh and Key respectively.

Similarly, the specific claim of error appellants raise concerning their Instructions 11-13 were never raised in the district court.  Appellants asked the court to include in its charge the final paragraph of their proposed Instruction 11, that bribery requires a specific *quid pro quo*, but said nothing about the court's decision not to give earlier language in that same Instruction.  Appellants do not complain about the district court's failure to use their proposed *quid pro quo* paragraph.  Instead, they complain that the court refused to include earlier language in the proposed Instruction that states that 18 U.S.C. § 666 only prohibits those gifts to government officials that are "given with the intent to influence or reward."  They further complain that the court should have included their proposed Instruction's definition of "corruptly."  Because these claims were never raised below, they were waived.

In any event, the court did not err by refusing any of appellants' proposed Instructions because the charge given by the court adequately covered appellants' theories of the defense.  Indeed, the words they claim the court should have used are virtually identical to the words the court actually used.  Specifically, the court charged the jury that to convict any defendant of bribery under section 666, it must find that the defendant "knowingly gave…things of value" to a government employee, and in doing so "acted corruptly" in "intend[ing] to influence or

30

reward" that government employee.  The court defined acting "corruptly" as an act "performed voluntarily, deliberately, and dishonestly for the purpose of accomplishing an unlawful end or result, or for the purpose of accomplishing some otherwise lawful end or lawful result by an unlawful means or unlawful method."  The court then expressly charged that not all gifts to government employees are unlawful:

> Section 666 does not prohibit all gifts to a public official or governmental agent, but only those gifts that are given with the corrupt intent to influence or reward....

Thus, the jury could not convict unless it found that the particular payment to McNair was made "with the corrupt intent to influence or reward."  Since a jury is presumed to follow the court's instructions, it could not have convicted appellants because they made legitimate payments for services rendered.  Rather, the jury must have found that payments were made with the corrupt intent to influence or reward McNair.  Because a defendant is not entitled to his specific wording so long as the charge given accurately states the requested proposition, *United States v. Duff*, 707 F.2d 1315, 1320-21 (11th Cir. 1983), the court's refusal to give appellants' Instructions 7-9 was not plain error.

The court's refusal to give appellants' Instruction 10 was not erroneous. The court expressly charged that section 666 "does not prohibit all gifts" to public

officials, only those "given with the corrupt intent to influence." Adding Instruction 10's additional language about "holiday gifts" would have added nothing because any gift given without the requisite corrupt intent would be lawful, while an alleged gift "given during respective holiday seasons," but given with a corrupt intent, would be unlawful.

To the extent that appellants press their *quid pro quo* argument, the district court's instructions adequately addressed that issue. This Court has rejected the argument that the government must "show a direct *quid pro quo* relationship between [the defendants] and an agent of the agency receiving federal funds." *Castro*, 89 F.3d at 1454; *Paradies*, 98 F.3d at 1289; *accord United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998) (a "payment need not be correlated with a specific official act...the intended exchange in bribery can be 'this for these' or 'these for these,' not just 'this for that'"). Appellants' *quid pro quo* instruction was, therefore, an incorrect statement of the law. The district court correctly explained to the jury that the government was required to prove that appellants acted corruptly in giving things of value to a county official with the intent "to influence or reward" that official "in connection with any business transaction, or series of transactions." Given these and other instructions charged

to the jury, the court did not commit plain error by refusing appellants' *quid pro quo* instruction. *Paradies*, 98 F.3d at 1289.

### D.    Grand Jury Issue

Appellants claim that after they were charged in the June 2005 Superceding Indictment, the government abused the grand jury process by subsequently using the grand jury for the primary purpose of preparing for trial on those charges.

A defendant claiming grand jury abuse "has the burden of showing that the Government's use of the grand jury was improperly motivated."[6] *E.g., United States v. Leung*, 40 F.3d 577, 581 (2d Cir. 1994). While the grand jury cannot be used "solely or even primarily" to gather evidence against an indicted defendant,[7] it can be used to investigate whether a defendant committed crimes not covered in the indictment. *E.g., United States v. Brothers Const. Co. of Ohio*, 219 F.3d 300, 314 (4th Cir. 2000); *United States v. Alred*, 144 F.3d 1405, 1413 (11th Cir. 1998).

---

[6] Appellants erroneously rely on *United States v. Kovaleski*, 406 F. Supp. 267, 271 (E.D. Mich. 1976), as placing this burden on the government. That case presented a "special problem" that does not exist here. 406 F.Supp. at 270. Defendant had testified at trial but a mistrial was declared when a juror died. Prior to the new trial the prosecutor examined a witness in the grand jury to determine if the defendant had committed perjury. However, the perjury investigation involved the "same issues" that the first trial, and defendant's testimony at that trial, "centered on." *Id.* In this case, after the grand jury indicted appellants for bribing Chandler and Ellis, its continued investigation "centered on" appellants' bribery of McNair, a completely separate issue.

[7] *United States v. Moss*, 756 F.2d 329, 332 (4th Cir. 1985). *See also Beverly v. United States*, 468 F.2d 732, 743 (5th Cir. 1972).

"[T]he law presumes, absent a strong showing to the contrary, that a grand jury acts within the legitimate scope of its authority." *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 300, 111 S.Ct. 722, 728 (1991); *accord Alred*, 144 F.3d at 1413.

The grand jury did not charge appellants with any crime in its February 3, 2005 Indictment.  Appellants were first charged with bribing Chandler and Ellis and obstructing justice in the June 22, 2005 Superceding Indictment.  While the Second Superceding Indictment expanded the charges against appellants, the new charges all concerned appellants' bribery of McNair.

Magistrate Judge Putnam concluded that there was no grand jury abuse after holding a pre-trial hearing that included reviewing the transcripts of the USI employees who testified in the grand jury after appellants were first indicted. Although seven USI employees testified before the grand jury in August 2005, Judge Putnam found that only two employees' testimony addressed charges in the Superceding Indictment.  Judge Putnam further found that "[m]ost of the questioning" of those two employees "dealt with payments made or dealings with McNair, not Chandler or Ellis."  Thus, Judge Putnam correctly concluded that, on this record, "it cannot be said that the 'sole or principal' purpose of the grand jury process was for discovery relevant to the already-charged offenses."  *See, e.g.,*

34

*Alred*, 144 F.3d at 1413; *United States v. Beasley*, 550 F.2d 261, 266 (5th Cir. 1977).

Appellants incorrectly state that Key "was convicted of obstruction of justice in Count 127, for allegedly failing to properly comply with the April [grand jury] subpoena, *while [he] was under indictment*." (Emphasis added.) Count 127 charged appellants with "providing a false letter of compliance with the grand jury subpoena." On May 24, 2005, prior to any USI defendant being indicted, Key signed a letter on behalf of appellants claiming that the largest gift he had given to any government employee was "valued at less than $50.00." This letter was false in light of Key's much larger "gifts" to Chandler and Ellis. Key was convicted of obstruction for actions he took prior to his indictment. The November 2005 subpoena was issued to investigate possible tax evasion by Key, but never generated any documents and, in fact, provided the government with no information.

Because the government did not use the grand jury "primarily" to obtain evidence that appellants bribed Chandler or Ellis or obstructed justice, appellants' grand jury abuse claim is rejected.

E.    **Sixth Amendment Issue**

The June 2005 Superceding Indictment was sealed for one month to allow the government to continue investigating appellants' bribery of McNair. While the Indictment was sealed, the FBI arranged, through USI counsel Chriss Doss ("Doss"), a July 7, 2005, interview with Key at Doss's office. Doss was present at the interview. The FBI agent believed that Doss was Key's attorney. The magistrate judge and the district court concluded that the agent's belief was reasonable.

The interview concerned almost exclusively the formation of USI, Key's role in the company, USI's and Key's dealings with McNair and McNair Studio, and personal and corporate financial issues. Key was asked a few questions concerning Chandler and Ellis. The interview resulted in an 18-page FBI Form 302 ("302").

Prior to trial, Key moved suppress the entire 302 as a violation of his Sixth Amendment right to counsel. At a hearing before Magistrate Judge Putnam, the government agreed to redact from the 302 all material relating to any of the charges pending against Key at the time of the interview. Judge Putnam found that the government's agreement to suppress mooted the motion to suppress. At trial, the FBI agent did not testify about any such statement made by Key. The

36

302 was neither entered into evidence nor seen by the jury.

"[A]n accused is denied 'the basic protections' of the Sixth Amendment' when there is used against him at his trial evidence of his own incriminating words, which federal agents…deliberately elicited from him after he had been indicted and in the absence of his counsel.'" *Fellers v. United States,* 540 U.S. 519, 523, 124 S.Ct. 1019, 1022 (2004), *quoting Masssiah v. United States*, 377 U.S. 201, 206, 84 S.Ct. 1199, 1203 (1964)).  The penalty for violation of this Sixth Amendment right is suppression of the accused's incriminating statements.  *E.g., McNeil v. Wisconsin*, 501 U.S. 171, 179, 111 S.Ct. 2204, 2209 (1991).  This Sixth Amendment right is "offense specific" and applies only to offenses for which an accused has been charged, not to other offenses still under investigation.  *E.g., McNeil*, 501 U.S. at 175-76, 111 S.Ct. at 2207-08; *United States v. Grimes*, 142 F.3d 1342, 1348 (11th Cir. 1998).  Thus, "a defendant's statements regarding offenses for which he had not been charged [are] admissible notwithstanding the attachment of his Sixth Amendment right to counsel on other charged offenses." *Texas v. Cobb*, 532 U.S. 162, 168, 121 S.Ct. 1335, 1340 (2001).

Accordingly, Key's July 7, 2005, statements to the FBI are admissible as to all matters except those relating to the charges then pending against him.  Because the government agreed not to offer any of Key's statements concerning his

pending charges, and because at trial it kept that promise, Key's Sixth Amendment right to counsel was not violated.

Key claims that his entire statement to the FBI must be suppressed because he was never informed that "he was in trouble" of any kind. That result would be contrary to the policy underlying the "charge specific" nature of the right to counsel. The government's "ready ability to obtain uncoerced confessions is not an evil but an unmitigated good." *McNeil*, 501 U.S. at 181, 111 S.Ct. at 2210. To that end, the "charge specific" limitation provides "a sensible solution to a difficult problem." *Maine v. Moulton*, 474 U.S. 159, 179-80, 106 S.Ct. 477, 489 (1985). Accordingly, Key's Sixth Amendment rights were not violated.

## III. CONCLUSION

For the foregoing reasons, the judgments of conviction are

**AFFIRMED.**

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

38